**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Karen Appeldorn, surviving widow, | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| vs. | ) | |
| | ) | |
| Hartford Life and Accident Insurance | ) | Case No. 1:09-cv-069 |
| Company, a foreign corporation, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Defendant's motion for summary judgment filed on June 25, 2010. See Docket No. 13. The Plaintiff filed a response in opposition to the motion on July 15, 2010. See Docket No. 18. On July 29, 2010, the Defendant filed a reply brief. See Docket No. 19. For the reasons set forth below, the Court grants the motion.

**I.     BACKGROUND**

The plaintiff, Karen Appeldorn ("Appeldorn"), is the surviving spouse of Eugene Appeldorn. Eugene Appeldorn was employed by Basin Electric Power Cooperative ("Basin Electric") at the time of his death. Basin Electric sponsored an employee welfare benefit plan providing accidental death and dismemberment business travel insurance coverage and benefits to eligible participants and beneficiaries. To fund the plan, Basin Electric purchased Policy ETB-104030 from the defendant, Hartford Life and Accident Insurance Company ("Hartford"). Eugene Appeldorn served on the board of directors for Basin Electric from 2003 until his death in February 2008 and was a participant under Policy ETB-104030.

On February 12, 2008, Eugene Appeldorn traveled by corporate jet to Bismarck, North Dakota to attend Basin Electric's board of director's meeting to be held the following day. Mr. Appeldorn had "cold" symptoms for several days before the flight. The pressurization system in the plane functioned normally, but Mr. Appeldorn complained of severe pain in his ear and head during the flight. Upon arriving in Bismarck, Mr. Appeldorn sought medical attention at an urgent care facility and was diagnosed with a middle ear infection. Mr. Appeldorn then went to his hotel room and did not join his travel companions for dinner. On the morning of February 13, 2008, Mr. Appeldorn was found dead in his hotel room.

Dr. William Massello III, from the North Dakota State Forensic Medical Examiner's Office, conducted an autopsy on February 14, 2008 which included the following:

> POSTMORTEM SUMMARY:
>
> This 65-year old white male was found dead in his motel room. He had been under medical treatment for an ear infection. Postmortem examination revealed lethal bacterial meningitis, an infection of the coverings of the brain and spinal cord. Bacterial cultures of the infectious material revealed that it was caused by a bacterium called the pneumococcus. There were no other abnormalities of the internal organs which would have caused or contributed to his death.

See Docket No. 16-1, p. 90.

In March 2008, Karen Appeldorn, as Eugene Appeldorn's widow and named beneficiary, filed a claim with Hartford for benefits under Policy ETB-104030 in the amount of $500,000.00. On May 3, 2008, Dr. Kenneth Carter, Eugene Appeldorn's family practitioner, sent Hartford a letter in which Dr. Carter opined:

> Pneumococcal meningitis in adults is quite unusual per my 40 years as a physician. This is an organism that is frequently found causing ear infections in children and adults. It is likely that the nidus for the patient's meningitis began in the patient's ear. I believe that there is a direct relationship between his otitis media and his meningitis. I further believe that the increased pressure inside the ear related to

>   depressive/pressurization, which likely was caused by his cold and eustachian tube dysfunction, caused a septic embolus to go from his middle ear into the meningeal space, causing the meningitis. The rapidity with which the patient went from being in good health to being found dead was so quick that it is unlikely that any other symptoms were going on. I believe I can state with confidence that there is a direct relationship between the patient's flight and the meningitis that subsequently claimed his life.

See Docket No. 16-2, p. 7. Hartford hired Dr. Daniel McQuillen, who is board certified in internal medicine and infectious disease, to conduct an independent medical record review. On August 8, 2008, Dr. McQuillen concluded, "The record offers no medical evidence to support Dr. Carter's theory of a septic embolus of *S. pneumoniae* from the middle ear to the subarachnoid space." See Docket No. 16, p. 107.

On August 25, 2008, Hartford sent Appeldorn a letter, informing her that her claim was denied because "Mr. Appeldorn's loss does not meet the Policy's definition of Injury." See Docket No. 16-1, p. 30. Appeldorn appealed the denial decision by letter dated October 24, 2008. See Docket No. 16, pp. 91-92. On December 10, 2008, Dr. Mark Friedman, who is board certified in internal medicine, submitted an independent medical record review to Hartford. See Docket No. 16, pp. 63-66. Dr. Friedman concluded the following:

>   **REFERRAL QUESTION:** "Is there a direct relationship between the insured's flight (altitude, ascending and descending) and the meningitis that subsequently claimed his life?"
>
>   **RESPONSE:** In my opinion there is no evidence of a direct relationship between the insured's flight and the meningitis that led to his death. There is no literature that supports the proposed mechanism of spread from the middle ear to the brain, nor did the autopsy demonstrate evidence of a middle ear infection.

See Docket No. 16, p. 66. By letter dated December 16, 2008, Hartford upheld its denial of Appeldorn's claim. See Docket No. 16, pp. 70-72. Both parties agree that Appeldorn has exhausted her administrative remedies.

On October 29, 2009, Appeldorn commenced this lawsuit under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.  Appeldorn contends that there is a genuine issue of material fact created by the medical experts as to the mechanism by which the disease was spread from the middle ear into the meningeal space, particularly whether this resulted from an "injury."

Hartford contends that Appeldorn died in his hotel room from meningitis, a disease, and that Appeldorn's family physician's opinion lacks any evidentiary or medical basis.  Hartford further asserts that even if there was a basis for the physician's opinion, the policy would not cover Mr. Appeldorn's death because an individual's internal reaction to ordinary conditions on an uneventful airplane flight does not constitute an "accident" as a matter of law.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to the fact-finder or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th

Cir. 2005). The moving party bears the burden of demonstrating an absence of a genuine issue of material fact. Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### III.     LEGAL DISCUSSION

ERISA regulates employee benefit plans, including employee welfare benefit plans. ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1)(A). A participant in an ERISA-regulated plan, or the beneficiary, may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties agree that Eugene Appeldorn was a participant in Policy ETB-104030, an ERISA-regulated plan. Karen Appeldorn, Eugene Appeldorn's beneficiary, brought this ERISA action to recover benefits from her husband's policy.

Federal common law applies to benefit claims under ERISA. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987). It is well-established that "[t]he district court's review of plan determinations is *de novo*, unless the plan grants discretionary authority to the plan administrator 'to determine eligibility for benefits or to construe the terms of the plan.'" Johnson v. U.S. Bancorp Broad-Based Change In Control Severance Pay Program, 424 F.3d 734, 738 (8th Cir. 2005) (quoting

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  Both parties agree the correct standard of review in this case is *de novo*.

When reviewing an ERISA plan *de novo*, the Court begins by examining the language of the plan documents.  Bond v. Cerner Corp., 309 F.3d 1064, 1067 (8th Cir. 2002) (citing DeGeare v. Alpha Portland Indus., 837 F.2d 812, 816 (8th Cir. 1988)).  In doing so, the Court looks to federal common law to construe disputed terms in a plan.  King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994, 998 (8th Cir. 2005).  The Court must "interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'"  Adams v. Cont'l Cas. Co., 364 F.3d 952, 954 (8th Cir. 2004) (quoting Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 789-90 (8th Cir. 2002)).  "If any part of the plan document is ambiguous, the court looks at the entire document and even extrinsic evidence to determine its intent and purpose."  Pendleton v. QuikTrip Corp., 567 F.3d 988, 992-93 (8th Cir. 2009) (citing Jensen v. SIPCO, Inc., 38 F.3d 945, 950 (8th Cir. 1994)).

Policy ETB-104030 covers several "Hazards" including "injury resulting from an accident which occurs anywhere in the world during a Business Trip," including "an injury resulting from an accident which occurs while the Insured Person is a passenger on, boarding or alighting from a Civil Aircraft . . . ."  See Docket No. 16, p. 11.  The policy defines "injury" and "business trip" as follows:

> Injury means, and an Insured Person is covered for, bodily injury resulting directly and independently of all other causes from accident which occurs:
> a) while he or she is covered under; and
> b) in the manner specified in;
> a Hazard applicable to his or her class.

6

>  Loss resulting from:
>  a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or
>  b) medical or surgical treatment of a sickness or disease
>
>  is not considered as resulting from injury.
>
>  Business Trip means a bona fide trip:
>  a) while on assignment or at the direction of the Policyholder for the purpose of furthering the business of the Policyholder;
>  b) which begins when a person leaves his or her residence or place of regular employment, whichever last occurs, for the purpose of beginning the trip;
>  c) which ends when he or she returns to his or her residence or place of regular employment, whichever first occurs; and
>  d) excluding travel to and from work, bona fide leaves of absence and vacations.

See Docket No. 16, p. 8. The policy does not define "accident" or "sickness or disease." The parties agree that Eugene Appeldorn died while on a "business trip" as defined by the policy.

Eugene Appeldorn died from bacterial meningitis. Appeldorn contends that her husband's death was the result of an "injury" as defined by the policy, meaning that his death resulted from an "accident" and not from "sickness or disease." Appeldorn further contends that Dr. Carter's opinions create a genuine issue of material fact.

Hartford contends that Dr. Carter's opinion that the airplane flight contributed to the spread of the disease is neither supported by the physical evidence nor medical theory. Hartford further contends that even if Dr. Carter's opinion was probative, no benefits would be payable because ordinary pressure changes on an airplane do not constitute an "accident" under the policy.

The United States Supreme Court has held that in claims against an airline, pursuant to Article 17 of the Warsaw Convention[1], the term "accident" does not cover "when the injury

---

[1] "Article 17 of the Warsaw Convention establishes the liability of international air carriers for harm to passengers." Air France, 470 U.S. at 397. It states: "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which

indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." Air France v. Saks, 470 U.S. 392, 406 (1985) (holding that the air carrier was not liable under Article 17 of the Warsaw Convention for the passenger's hearing loss caused by the normal operation of the airplane's pressurization system).  "[W]hile interpreting the term 'accident' broadly . . . courts have refused to extend the term to cover routine travel procedures that produce an injury due to the peculiar internal condition of a passenger." Id. at 404-05 (citations omitted).

In Olympic Airways v. Husain, 540 U.S. 644 (2004), a passenger on an airplane allegedly died from an asthma attack during a flight and the passenger's wife brought a wrongful death action against the airline under Article 17 of the Warsaw Convention.  The passenger was seated near the smoking section and a flight attendant refused three times to assist him in changing his seat.  The United States Supreme Court used the reasoning set forth in Air France and held that the flight attendant's conduct was "unusual or unexpected," thus constituting an "accident" under the Warsaw Convention.  Olympic Airways, 540 U.S. at 645.

A recent case in this circuit applied the same reasoning the Supreme Court used in defining "accident" under the Warsaw Convention in defining "accident" under ERISA policies.  In McAuley v. Fed. Ins. Co., No. 4:05CV1826, 2009 WL 913510 (E.D. Mo. Mar. 31, 2009), the ERISA policies covered death resulting from an accident while on a business trip but did not cover death by sickness or disease.  The plaintiffs contended that the plan participant died of deep vein thrombosis (DVT), caused by the long flight he took while on business.  Nothing out of the ordinary occurred on the

---

caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." Id. at 397-98 (quoting 49 Stat. 3018-19).  The text of the Warsaw Convention does not define the term "accident."

flight.  The district court noted several factors identified in Olympic Airways that constitute an accident: "an event which is unusual, unexpected, and external to the passenger."  McAuley, 2009 WL 913510, at *18 (citing Olympic Airways, 540 U.S. at 652).  The district court found that developing DVT on an ordinary flight did not amount to an "accident" under the policies and the plaintiffs did not demonstrate that they were entitled to benefits under the policies.  While the court applied the abuse-of-discretion standard to the case, it held that it would come to the same conclusion under *de novo* review.  McAuley, 2009 WL 913510, at *23.

There is no body of ERISA case law dealing with death from meningitis following a flight, but there is at least one ERISA case that adopted the Warsaw Convention reasoning when defining the term "accident."  See McAuley, 2009 WL 913510, at *18 (finding the reasoning the Supreme Court used in defining "accident" under the Warsaw Convention "to be lucid and reasonable on the question of what constitutes an 'accident'" under an ERISA policy).  The facts in the present case lead the Court to adopt the same reasoning.  As in McAuley, Appeldorn's flight was uneventful and the pressurization system functioned normally.  Applying a *de novo* standard of review, the Court concludes, as a matter of law, that developing the disease of meningitis on an ordinary and uneventful airplane flight does not qualify as an "injury" or an "accident" under Policy ETB-104030.

**IV.    CONCLUSION**

The Court has carefully reviewed and considered the briefs, administrative record, and relevant policy provisions at issue, and concludes that Hartford's decision to deny benefits is not contrary to the understanding of the ordinary lay person or the understanding of an average plan participant.  For the reasons set forth above, the Court **GRANTS** the Defendant's motion for summary judgment (Docket No. 13).

**IT IS SO ORDERED.**

Dated this 2nd day of September, 2010.

>                        */s/  Daniel L. Hovland*
>                        Daniel L. Hovland, District Judge
>                        United States District Court